DAVID H. KRAMER, State Bar No. 168452
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Phone: (650) 496-9300
Fax: (650) 493-6811
Email: dkramer@wsgr.com

MICHAEL H. RUBIN, State Bar No. 214636
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Phone  (415) 947-2000
Fax     (415) 947-2099
Email: mrubin@wsgr.com

*Attorneys for Petitioner*
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE INC., | CASE NO.: 15-mc-80208 |
|      Petitioner, | CASE IN OTHER COURT: No.  3:14-cv-00981-HTW-LRA  (S.D. Miss.) |
|      v. | |
| ORRICK,  HERRINGTON  &  SUTCLIFFE LLP, | **GOOGLE INC.'S NOTICE OF MOTION AND MOTION TO COMPEL COMPLIANCE WITH SUBPOENA AND MEMORANDUM OF POINTS AND AUTHORITIES** |
|      Respondent. | |
| | Date:      TBD |
| | Time:     TBD |
| | Judge:    TBD |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................2

BACKGROUND ..................................................................................................................5

A.  Special Interest Groups and AG Hood ....................................................................5

B.  Google's Complaint and the Preliminary Injunction ...............................................8

C.  Google's Discovery to Date .....................................................................................9

D.  Google's Subpoena to Orrick and Orrick's Refusal to Produce Any Information ...........10

ARGUMENT ....................................................................................................................11

I.  Google Seeks Plainly Relevant Information Regarding Orrick's Role In AG Hood's Illicit Conduct...........................................................................................................11

II.  Orrick Has Not Validly Asserted Any Privilege ....................................................14

    a.  Work Product ...................................................................................................17

    b.  The "Law Enforcement" Privilege ..................................................................18

    c.  "Common Interest Doctrine" ...........................................................................19

    d.  The Attorney Client Privilege .........................................................................21

    e.  The Requests Are Not Unduly Burdensome ....................................................22

CONCLUSION ..................................................................................................................24

# TABLE OF AUTHORITIES

<u>**Page**</u>

## CASES

*Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc.*, No. 12-CIV-1579 (HB),
2013 U.S. Dist. LEXIS 41785 (S.D.N.Y. Mar. 25, 2013)....................................................23

*Bank of America, N.A. v. Terra Nova Insurance Co.*,
212 F.R.D. 166, 172-74 (S.D.N.Y. 2002) ...........................................................................16

*Baricuatro v. Industrial Personnel & Management Services, Inc.*,
No. 11-2777, 2013 U.S. Dist. LEXIS 96413 (E.D. La. July 5, 2013)..........................16, 20

*Blackard v. Hercules, Inc.*, No. 2:12-CV-175-KS-MTP,
2014 U.S. Dist. LEXIS 75934 (S.D. Miss. June 4, 2014) ....................................................22

*Burlington Northern & Santa Fe Ry. v. United States Dist. Court*,
408 F.3d 1142 (9th Cir. 2005).............................................................................................22

*Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589 (W.D.N.Y. 1996) .......................................22

*Cante v. Baker*, No. 07-CV-1716 (RK),
2008 U.S. Dist. LEXIS 38091 (E.D.N.Y. May 9, 2008).....................................................17

*Coughlin v. Lee*, 946 F.2d 1152 (5th Cir. 1991) ............................................................................18

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008).....................................................................13

*Doyle v. Gonzales*, No. S-11-0066 GEB,
2011 U.S. Dist. LEXIS 100639 (E.D. Cal. Sept. 6, 2011) ..................................................18

*Elan Microelectronics Corp. v. Apple, Inc.*, No. C-09-01531-RW,
2011 U.S. Dist. LEXIS 87989 (N.D. Cal. Aug. 8, 2011)....................................................20

*Felham Enters. (Cayman) Ltd. v. Certain Underwriters at Lloyds*,
No. Civ. A. 02-3588, 2004 WL 2360159 (E.D. La. Oct. 19, 2004)....................................22

*Ferko v. NASCAR*, 219 F.R.D. 403 (E.D. Tex. 2003) ...................................................................20

*Google Inc. v. Digital Citizens Alliance, et. al.*,
Case No. 1:15-mc-00707-JEB-DAR (D.D.C.)....................................................................10

*Google Inc. v. Twenty-First Century Fox, Inc., et. al.*,
Case No. 15-misc-150 (S.D.N.Y.) .................................................................................10, 14

*Hayslett v. City of San Diego*, No. 13-CV-1605-W,
2014 U.S. Dist. LEXIS 37738 (S.D. Cal. Mar. 21, 2014)...................................................18

*Heller v. City of Dallas*, 303 F.R.D. 466 (N.D. Tex. 2014) ..........................................................22

*Ibrahim v. Dep't of Homeland Sec.*, No. C-06-00545 WHA,
2013 U.S. Dist. LEXIS 56663 (N.D. Cal. Apr. 19, 2013)...................................................18

*In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542 (N.D. Cal. 2005)................................................23

1   *In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010) ..........................................21

2   *In re Chevron Corp.*, 749 F. Supp. 2d 170 (S.D.N.Y. 2010) ..........................................22

3   *In re Grand Jury Subpoenas Dated March 9, 2001*,
      179 F. Supp. 2d 270 (S.D.N.Y. 2001) ......................................................................21

4

   *In re Oracle Sec. Litig.*, No. C-01-0988 MJJ,
5       2005 U.S. Dist. LEXIS 46931 (N.D. Cal. Aug. 5, 2005).........................................16

6   *In re Santa Fe Int'l Corp.,* 272 F.3d 705 (5th Cir. 2001) ........................................15, 19

7   *Info. Res. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591 (S.D.N.Y. 1998)....................17

8   *Integrated Global Concepts, Inc. v. j2 Global, Inc.*, No. 5:12-CV-034340RMW,
      2014 U.S. Dist. LEXIS 7294 (N.D. Cal. Jan. 21, 2014) ......................................19

9

10  *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575 (N.D. Cal. 2007) ......................................20

   *North Pacifica, LLC v. City of Pacifica*,
11     274 F. Supp. 2d 1118 (N.D. Cal. 2003) ..................................................................21

12  *Three Crown Ltd. P'ship v. Salomon Bros.*, No. 92 Civ. 3142 (RPP),
      1993 U.S. Dist. LEXIS 9995 (S.D.N.Y. July 21, 1993)........................................17

13

   *Tiger Capital, LLC v. PHL Variable Ins. Co.*, No. 12-CIV-2939 (CM),
14     2013 U.S. Dist. LEXIS 121395 (S.D.N.Y. Aug. 26, 2013) ..................................23

15  *United States ex rel. Burroughs v. DeNardi Corp.*,
      167 F.R.D. 680 (S.D. Cal. 1996)............................................................................18

16

   *United States v. Chevron Texaco Corp.*,
17     241 F. Supp. 2d 1065 (N.D. Cal. 2002) ..................................................................21

18  *United States v. El Paso Co.,* 682 F.2d 530 (5th Cir. 1982) ..............................16, 17, 21

19  *United States v. Martin*, 278 F.3d 988 (9th Cir. 2002) ....................................................15

20  *United States v. McGraw-Hill Cos.*, No. CV-13-779-DOC,
      2014 U.S. Dist. LEXIS 59408 (C.D. Cal. Apr. 15, 2014)....................................18

21

   *United States v. Torf (In re Grand Jury Subpoena)*,
22     357 F.3d 900 (9th Cir. 2003) ..................................................................................17

23  *Viacom Int'l, Inc. v. YouTube, Inc.*, No. C-08-80211,
      2009 U.S. Dist. LEXIS 4220 (N.D. Cal. Jan. 14, 2009) ......................................23

24

   *Vieste, LLC v. Hill Redwood Dev.*, No. C-09-04024-JSW,
25     2010 U.S. Dist. LEXIS 126607 (N.D. Cal. Nov. 18, 2010).................................22

26  *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir. 1979) ......................................................12

27  *Younger v. Harris*, 401 U.S. 37 (1971) ..........................................................................12

28

**STATUTES**

Section 230 of the Communications Decency Act, 47 U.S.C. § 230...............................................13

Miss. Code Ann. § 5-8-3(k) ..........................................................................................................15

Mississippi Public Records Act, Miss. Code Ann. § 25-61-1 ......................................................16

**RULES**

Fed. R. Civ. P. 45 ................................................................................................................ *passim*

**MISCELLANEOUS**

Charles Wright & Arthur Miller, Fed. Prac. & Proc. § 2464 .......................................................22

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that as soon as the matter may be heard at the United States District Court, Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Petitioner Google Inc. ("Google") will, and hereby does, move the Court for an order compelling Respondent to produce documents pursuant to a subpoena issued by Google out of the United States District Court for the Southern District of Mississippi. This motion is made pursuant to Rule 45 of the Federal Rules of Civil Procedure. Pursuant to Civil Local Rule 37-1, counsel met and conferred on June 26, 2015 and were unable to resolve the issues that are the subject of this motion.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the accompanying Declaration of Michael H. Rubin and attached exhibits, a proposed order, any papers submitted in reply to any opposition to this Motion, facts of which this Court may take judicial notice, the record in the underlying action in the United States District Court for the Southern District of Mississippi, Case No. 3:14-cv-00981-HTW-LRA, arguments of counsel if any, and any other matters as may properly come before this Court.

**STATEMENT OF THE ISSUES**

1.     Should Respondent be compelled to produce documents responsive to Google's subpoena?

**INTRODUCTION**

Google Inc. ("Google") respectfully seeks the assistance of this Court to compel compliance with a subpoena issued in connection with litigation in the Southern District of Mississippi, where Google sued Mississippi Attorney General Jim Hood ("AG Hood"). That Mississippi court has already issued a preliminary injunction prohibiting AG Hood from violating Google's constitutional and federal statutory rights, and Google now seeks evidence to prove its claims on the merits.

For the past two years, AG Hood has repeatedly threatened Google, demanding it remove content from its online services that he and a group of powerful special interests deem objectionable. When Google refused his ultimate demands citing the protections of federal law, AG Hood retaliated with a vexatious 79-page Civil Investigative Demand ("CID").[1] In March of this year, with the benefit of a substantial evidentiary record, the Honorable Henry Wingate of the Southern District of Mississippi concluded there was "significant evidence" that AG Hood's CID was issued in "bad faith" with retaliatory intent and that there is a "substantial likelihood" that Google will prevail on its claims that AG Hood was violating Google's First and Fourth Amendment rights.[2] The court therefore enjoined AG Hood from enforcing his CID, filing charges against Google merely for making third-party content accessible to Internet users, or otherwise taking further action against Google pending a final decision on its claims.[3] Judge Wingate also set an expedited case schedule, allowing a very limited time for discovery.[4]

---

[1] The document is formally titled "Administrative Subpoena" rather than "Civil Investigative Demand." It contains 141 document requests and 62 interrogatories, demanding the production of an extraordinarily broad array of information. It is so large that it includes a table of contents.

[2] Declaration of Michael H. Rubin in Support of Google Inc.'s Rule 45 Motion to Compel Compliance with Subpoena ("Rubin Decl."), Exhibit ("Exh") 30, Exh. 31 at 14 (March 2 Order granting Google's Motion for Temporary Restraining Order and Preliminary Injunction and March 27 PI Order elaborating on that ruling).

[3] Rubin Decl., Exh. 31 at 22 ("PI Order").

[4] Rubin Decl., Exh. 30 at 4. After AG Hood represented that his office was unable to timely produce documents that Google requested because a member of his staff was ill, Judge Wingate recently extended the discovery period by 30 days. Dkt. 133, *Google Inc. v. Hood*, Case No. 3:14-cv-00981-HTW-LRA (S.D. Miss. Dec. 19, 2014) (discovery now closing in the underlying

(continued...)

1   Although Google's lawsuit is against AG Hood, discovery to date has revealed that a coa-

2   lition of anti-Google special interests were responsible for setting his agenda and for driving his

3   illicit campaign.  This group included the Motion Picture Association of America (the "MPAA")

4   and its member movie studios, and appears to also include Microsoft Corporation ("Microsoft"),

5   operating through its lobbyists at Orrick, Herrington & Sutcliffe LLP ("Orrick").  Together, this

6   group exercised remarkable influence in Mississippi.[5]  Documents already produced by AG

7   Hood and other non-parties—as well as documents uncovered by reporters—reveal that they

8   formulated a list of demands for AG Hood to send to Google; ghost wrote letters to Google that

9   AG Hood sent; dictated the timing of his investigative escalations; tried to recruit others gov-

10  ernment officials to support him; and even helped prepare the 79-page CID at the center of this

11  case.[6]

12

13

14

15      (...continued from previous page)

16  case on August 10, 2015). All citations herein to "MS Dkt." refer to the docket in the underlying
    action pending before Judge Wingate.

17  [5] *See* Rubin Decl. ¶ 2; Russell Brandom, "Project Goliath: Inside Hollywood's Secret War
18  Against Google," The Verge, (Dec. 12, 2014), *available at*
    <http://www.theverge.com/2014/12/12/7382287/project-goliath> (hereafter "Brandom Article").

19  [6] The CID was sent as a final step when various other measures failed to pressure Google into
20  silencing speech as AG Hood and his allies sought.  At that point, "word came down" from the
    MPAA's main lobbyist "that 'the time for letter writing is over' and that 'it is time to move to
21  actually form an investigation.'"  He declared:

22      Some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing
        CIDs [and] [i]n terms of outreach and action by us, I think we should: a. Shore up
23      Hood and try to get a small group . . . focused on a clear timetable for CIDs[;] b.
        Draft the CIDs[; and] c. Research state law to determine the best state to pursue liti-
24      gation and communicate that to Hood so that he can try to get the right AGs on
        board.

25  *See* Joe Mullin, "Hollywood v. Goliath: Inside the Aggressive Studio Effort to Bring Google to
26  Heel," Ars Technica (Dec. 19, 2014), available at <http://arstechnica.com/tech-policy/2014/12/
    how-hollywood-spurned-by-congress-pressures-states-to-attack-google/> (hereafter "Mullin Ar-
27  ticle"). It is not clear from the limited documents Google has seen whether Orrick was on this
    email, though they were clearly involved in the lead up to it.

28

Orrick was intimately involved in these efforts, helping to set strategy,[7] crafting responses to communications from Google,[8] reaching out to other state Attorneys General on AG Hood's behalf,[9] and choreographing his presentations.[10]  Given Orrick's key role, Google subpoenaed it for information about the behind-the-scenes maneuvering that fostered AG Hood's violations of Google's Constitutional and federal rights.

The subpoena at issue here seeks targeted information from Orrick that is directly related to AG Hood's actions.  This includes the lobbyists' direct correspondence with AG Hood, as well as communications among themselves and their cohorts that reference both AG Hood and Google.  Google also seeks information relating to Orrick's campaign donations to AG Hood and other assistance it provided, such as advocacy pieces, ghost written documents, research, and solicitations of others to the cause.

To date, Orrick has refused to produce anything.  It has withheld all responsive documents, objecting that they are irrelevant or protected by some unsubstantiated privilege.

The relevance objections are meritless.  As Judge Wingate has already held, there is substantial evidence that AG Hood's actions against Google were undertaken in bad faith and for a retaliatory purpose.  The requested documents will provide further support for that finding at trial.  Google expects the documents will show that AG Hood, and those interest groups animating him, understood that his actions invaded the exclusive province of federal law.  More fundamentally, the documents are likely to show that AG Hood's investigation was intended not to uncov-

---

[7] Rubin Decl., Exh. 12, JB_00000546 (January 15, 2014 email from Orrick's Brian Moran to Hood staffers, Orrick's Rob McKenna, and others in which Moran says he will draft a "one page strategy paper").

[8] Rubin Decl., Exh. 20, MPAA00001998 (January 20, 2014 email in which AG Hood asks Rob McKenna to "please help me refute or explain" items in Google letter.).

[9] Rubin Decl., Exh. 13, JB_00000400 (June 4, 2014 email exchange regarding overtures by AG Hood to the Connecticut attorney general regarding Google in which Orrick reports having briefed him the month before and "providing our research to him in person.").

[10] New Decl., Exh. 14, JB_00000014-16. (January 16-17, 2014 email exchange in which Orrick's Rob McKenna and the MPAA's lobbyist, Tom Perrelli, discuss the substance and logistics of AG Hood's presentation to other state attorneys general in Denver).

er supposed violations of Mississippi law, but instead to actively coerce Google into censoring protected speech (such as search results, user-generated content and advertising), at the behest of special interest groups, in violation of Google's constitutional rights and federal law.  Orrick's relevance objections cannot stand.

Its privilege assertions are similarly misplaced.  As a general matter, the communications at issue do not fall under the purview of any privilege because Orrick was engaged in lobbying government officials, not the provision of legal services.  The assertions of individual privileges fare no better.  Orrick invokes "work product protection" but cannot identify any litigation it contemplated at the time the requested documents were created because none was.  It claims there is a "law enforcement" privilege shielding its activities from discovery, but no such privilege applies here.  And it asserts "common and joint interest privileges" but cannot articulate any valid "interest" that creates or preserves a privilege.  While *some* responsive documents *might* theoretically be subject to the attorney-client privilege, Orrick has not even collected or reviewed such documents, let alone provided a privilege log for them.

Given the expedited discovery schedule set in this case, Google can wait no longer.  It respectfully requests that Orrick be ordered to produce the documents responsive to the subpoena immediately.[11]

## BACKGROUND

### A.  Special Interest Groups and AG Hood

In late 2014, the *New York Times* reported that a collection of special interests had been engaged in an extensive and secret anti-Google lobbying campaign with state attorneys general.[12]

---

[11] This motion is not brought in isolation. Google seeks similar orders against six other entities, each of which has asserted the same relevance objection and similar privilege objections. In the interests of judicial economy, and to avoid potential inconsistencies in fact-finding or outcomes, Google will promptly submit a motion under Rule 45(f) to transfer this motion to the Southern District of Mississippi.  Google's other motions to compel have already been transferred to Mississippi. Rubin Decl., Exhs. 2-5.

[12] Nick Wingfield and Eric Lipton, *Google's Detractors take Their Fight to the States*, The New York Times (Dec. 16, 2014), *available at* <http://www.nytimes.com/2014/12/17/technology/googles-critics-enlist-state-attorneys-general-in-their-fight.html>.  In its reporting, the Times

(continued...)

1   Having failed to gain federal support for their positions, this group, which included Orrick's cli-

2   ent Microsoft, hoped state officials could be more easily convinced to pressure Google to modify

3   its online services and restrict both its own speech and the speech of its users.  By the fall of

4   2012, the group had the vanguard for their anti-Google agenda in Mississippi's Attorney Gen-

5   eral, Jim Hood.

6        Although Google has been hamstrung in discovery thus far, the few documents it has re-

7   ceived reveal an insidious plot, hatched by AG Hood and these parties, to pressure Google to

8   censor speech.  That plan included, among other things, a concerted PR "attack" on Google using

9   the media properties of motion picture conglomerates, the manipulation of Google's stock price,

10  and a trumped up SEC filing.  *See* Rubin Decl., Exh. 24, D000904-908 (email and document dis-

11  cussing AG Hood's overall plan for going after Google).  As a "final step," if none of those tac-

12  tics worked, the plan called for AG Hood to seek to coerce Google's compliance by sending it a

13  civil investigative demand.  *Id*.

14       Together with other lobbyists, Orrick, principally through former Washington Attorney

15  General, Rob McKenna, played a key role in implementing this overall plan.  Orrick helped AG

16  Hood find outlets for press pieces smearing Google.  *See* Rubin Decl., Exh. 25, D001319-1323

17  (June 22-July 9, 2013 email chain among Rob McKenna, Jack Evans and John Kelly of Mi-

18  crosoft, AG Hood, and others regarding the potential placement of an Op-Ed piece titled

19  "Google:  The Search Engine for Illegal Drugs" by AG Hood).[13]  It devised a strategy for enlist-

20  ing the support of other state attorneys general,[14] and it reached out directly to many of them on

21  ────────────────────

22       (...continued from previous page)
    drew upon documents obtained through public records requests and from an industry insider fol-

23  lowing the well-publicized revelation of a cache of emails from Sony Entertainment after a re-
    ported hack.

24  [13] In the thread, Orrick's McKenna wrote, "General Hood could use some help finding an outlet

25  for the op-ed below.  Ideas for how we could help?"  McKenna further offered "to discuss
    placement strategy with [Hood], if that would be helpful."  *Id*.

26  [14] Rubin Decl., Exh. 12, JB_00000546. (January 15, 2014 email from Brian Moran to Jenner at-

27  torneys, Hood staffers, and McKenna detailing the division of labor and providing a to-do list in
    advance of the National Association of Attorneys General meeting in January 2014; listing

28  which states' attorneys general Orrick "have provided detailed briefings to" about Google; and

    (continued...)

AG Hood's behalf.  *See, e.g.*, Rubin Decl., Exh. 15, JB_00000555 (Orrick writing to AG Hood's special deputy Mike Moore, who was simultaneously lobbying AG Hood for another party on this same issue, asking which attorney generals he wanted to call, and proposing to divide up responsibility for calling them).[15]  AG Hood's office actively sought Orrick's help in formulating his positions on Google and responding to Google's rebuttals,[16] and Orrick voluntarily reached out to AG Hood to provide "extensive research" regarding what Orrick called "Google's practices." Rubin Decl., Exh. 26, D001641-1645 (email from Orrick lobbyists to AG Hood stating "[we] would like to brief your staff and you on extensive research we have been doing on the issues you have been raising about Google's practices.").

All of these efforts, along with a large campaign fundraiser co-hosted by Orrick,[17] bore fruit, as AG Hood amped up pressure on Google.   Following a November 2012 meeting of states attorneys general, AG Hood sent Google a letter suggesting steps it should take "to eliminate or significantly reduce infringing activities." AG Hood was later clear about what would happen if Google did not "voluntarily" capitulate:

> [I]f you don't ... work with us to make some of these changes that we've been suggesting since November, then I'm going to call on my colleagues to issue civil investigatory demands or subpoenas....

---

(...continued from previous page)
stating that Moran will draft a "one page strategy paper," and Orrick and Jenner "will collaborate on sample screen shots for the AGs to consider employing.").

[15] *See also* Rubin Decl., Exh. 16, JB_00000399 (June 4, 2014 email in which AG Hood asked McKenna and Perrelli to "sen[d] your research memo on Connecticut law to George Jepsen…  If I don't talk him into issuing a CID to Google by Thursday, I will advise my colleagues that I intend to send ours in a couple of weeks."); *id*., Exh. 13, JB_00000400 (June 4, 2014 email in which McKenna responds to AG Hood that Orrick had briefed Connecticut attorney general Jepsen the month before, "providing our research to him in person.").

[16] Rubin Decl., Exh. 17, JB_00000333-34 (Febuary 21, 2014 request from Hood's office to Orrick and the MPAA for "feedback [and] suggestions" on letter from Google); *id*., Exh. 20, MPAA00001998 (AG Hood asking McKenna to "please help me refute or explain" items in a Google letter).

[17] Rubin Decl., Exh. 21, MPAA00001576.

1   Rubin Decl., Exh. 33 at 8:8-13 (transcript from June 2013 meeting of National Association of

2   Attorneys General).  Google responded that its operations were consistent with and protected by

3   federal law, that it would continue to work to address legitimate concerns, and that the threats

4   from AG Hood were improper.

5          In January 2014, Orrick's McKenna, along with the MPAA's lead lobbyist, Tom Perrelli,

6   flew to Denver and prepared AG Hood the day before a meeting he scheduled with Google and

7   other states' attorney general.[18]  That meeting produced similar demands, largely focused on fed-

8   eral intellectual property issues, and threats from AG Hood to Google which continued over the

9   next several months.  When those failed to yield the changes he wanted, on October 27, 2014,

10  AG Hood took the "final step" outlined in his plan months earlier: he served Google with a 79-

11  page CID that Orrick appears to have helped to draft.[19]

12     **B.   Google's Complaint and the Preliminary Injunction**

13         On December 19, 2014, Google filed a Complaint for Declaratory and Injunctive Relief

14  in the Southern District of Mississippi alleging, among other things, that the Mississippi Attor-

15  ney General violated Google's rights under the First, Fourth, and Fourteenth Amendments by

16  pursuing a retaliatory and overbroad investigation aimed at silencing Google's protected speech

17  and the speech of others.  MS Dkt. 1 (Complaint).  Google sought a Preliminary Injunction (the

18  "Injunction Motion") based on a substantial evidentiary record.  MS Dkt. 2, 3.  On March 2,

19  2015, Judge Wingate granted Google's motion preliminarily enjoining AG Hood from, among

20  others things, enforcing the CID.

21

22  _____

23  [18] *See* Rubin Decl., Exh. 27, D001338-1339 (January 20, 2014 email from McKenna to Hood in
    which McKenna writes, "Looking forward to discussing this with you, Jim.  I have some ideas.

24  Can you meet with Tom and me at 4:00 today at the Sheraton?").   Perrelli reported back to the
    MPAA, specifically mentioning McKenna and how "helpful" he had been in preparing the state

25  attorneys general, noting that Orrick and Microsoft "see the bigger picture."  *See* Mullin Article.

26  [19] *See* Rubin Decl., Exh. 16, JB_00000399 (June 4, 2014 email in which Hood asked McKenna
    and Perrelli to "Please give me your final suggestions on our draft CID.").  AG Hood listed a

27  draft of the CID in a privilege log he provided to Google.  *Id*., Exh. 22.  That claim of privilege is
    currently under review by Judge Wingate in Mississippi.

28

1   Judge Wingate detailed his reasoning in a March 27 Opinion. Rubin Decl., Exh. 31 (PI

2   Order).  He held that Google had demonstrated a "substantial likelihood" that AG Hood "has

3   violated Google's First Amendment rights by: regulating Google's speech based on its content;

4   by retaliating against Google for its protected speech (e.g., issuing the subpoena); and by seeking

5   to place unconstitutional limits on the public's access to information." *Id*. at 18.  According to

6   Judge Wingate, "[t]he Attorney General's interference with Google's judgment" through "threats

7   of legal action and an unduly burdensome subpoena" is likely to "produce a chilling effect on

8   Google's protected speech." *Id*. at 19.  That finding was based on "competent evidence showing

9   that the Attorney General issued the subpoena in retaliation for Google's likely protected speech,

10  namely its publication of content created by third-parties." *Id*; *see also id*. at 14 ("Google has

11  presented significant evidence of bad faith, allegedly showing that Attorney General Hood's in-

12  vestigation and issuance of the subpoena represented an effort to coerce Google to comply with

13  his requests regarding content removal.").  Judge Wingate also found "substantial merit" in

14  Google's Fourth Amendment claims given the "overbreadth of the subpoena in question."  He

15  explained that "Attorney General Hood's subpoena must comport with the requirements of the

16  Fourth Amendment and not wage an unduly burdensome fishing expedition into Google's opera-

17  tions." *Id*. at 19-21 (concluding the CID demanded information regarding copyright issues and

18  content that AG Hood knew was outside his enforcement purview).

19  **C. Google's Discovery to Date**

20      To support its case against AG Hood and shed more light on his illicit motives, Google

21  has sought discovery from the parties most closely involved in AG's Hood's anti-Google cam-

22  paign.  Google requested documents from *inter alia* the MPAA, its lobbyists at Jenner & Block,

23  and its member movie studios, relating to their multi-year effort to incite and direct AG Hood's

24  actions. Rubin Decl. ¶ 2.  Like Orrick, the other subpoenaed parties initially refused to produce

25  any documents at all.  *Id*. ¶¶ 5, 8.  But *unlike* Orrick, they ultimately agreed to produce their

26  communications directly with AG Hood, maintaining their objections as to everything else.  *Id*. ¶

27  5.

28

Google filed motions to compel against the movie studios in the Southern District of New York, and against the MPAA, Jenner and a third party in Washington D.C. Dkt. No. 1, *Google Inc. v. Twenty-First Century Fox, Inc., et. al*., Case No. 15-misc-150 (S.D.N.Y. June 1, 2015) ("NY Dkt."); Dkt. Nos. 1, 4, 5, *Google Inc. v. Digital Citizens Alliance, et. al*., Case No. 1:15-mc-00707-JEB-DAR (D.D.C. June 1, 2015) ("DC Dkt.").  On July 29, the Honorable Judge Lorna Schofield of the Southern District of New York transferred Google's motion to compel to Judge Wingate in Mississippi, and on July 31, the Honorable Magistrate Judge Deborah Robinson of the District for the District of Columbia did the same for the motion there. Rubin Decl. ¶¶ 10-11, Exhs. 2-5.

### D. Google's Subpoena to Orrick and Orrick's Refusal to Produce Any Information

The subpoena that Google sent to Orrick on May 21, 2015, contained eight, highly-targeted requests for documents:

- Documents relating or referring to Google and AG Hood, and/or his investigation into Google, including communications between or among Orrick, AG Hood, and other parties identified in published news reports as participating in the anti-Google lobbying effort (Requests No. 1, 2, 3, 8);

- Documents referencing code names for the efforts by Orrick and allied parties to influence AG Hood and other state Attorneys General to take action against Google, position papers that they developed in support of that effort, and other documents such as draft legal process and research connected to the effort that have been described in the news reports (Requests No. 5, 6, 7, 8);

- Documents relating or referring to support, financial or otherwise, provided directly by Orrick to AG Hood or his proxies (Request No. 4).

Rubin Decl., Exh. 1.

After Google extended Orrick's time to respond to the subpoena, Orrick served objections stating that it would produce nothing at all.[20]  It claimed that all communications between Orrick and AG Hood were somehow protected by the work-product, attorney-client, and/or law enforcement privileges. Rubin Decl., Exh. 7.  It also said that any communications it had with

---

[20] The subpoena listed a compliance date of June 8, 2015. Orrick requested an extension until June 15, 2015, to which Google agreed.

parties other than AG Hood were not relevant to the case and that complying with the subpoena would be an undue burden. *Id*.

In a June 26 Google meet-and-confer, Orrick explained that its communications with AG Hood were allegedly privileged because they came in response to requests from AG Hood.  Rubin Decl. ¶ 13.  In correspondence after the meet-and-confer, Orrick said that the subpoena was unduly burdensome because a preliminary search had identified 18,000 potentially responsive documents.  Rubin Decl., Exh. 8.  Further discussions yielded no progress on these issues.  To date, Google has not received a single document or privilege log from Orrick and the parties are at an impasse.  Rubin Decl. ¶¶ 17-18.  Google thus seeks the Court's assistance to break that impasse or, as set forth in the Rule 45(f) motion to be filed shortly, to transfer this dispute to Mississippi.

## ARGUMENT

### I.    Google Seeks Plainly Relevant Information Regarding Orrick's Role In AG Hood's Illicit Conduct.

One of the principal issues in Google's case against AG Hood is the question of what motivated his demands and threats to Google, culminating with a retaliatory and burdensome CID.  Was he actually investigating some supposed violation of Mississippi law, or was he engaged in coercive tactics, at the behest of Orrick, the MPAA, and other benefactors, to force Google to restrict constitutionally-protected speech.  Judge Wingate has already made clear his views.  On the record before him, he found Google likely to succeed on its claim that AG Hood's tactics were in retaliation for Google's refusal to "voluntarily" censor its speech (*e.g.* Google's search results), and thus violated Google's rights.  When the case is ultimately tried, Google expects that the evidence it uncovers though the subpoena at issue here will strongly support its claims.

Based on just the handful of documents that have come to light in discovery and through press accounts, there is little doubt that Orrick, along with other interested groups, actually directed the misconduct at issue in this case.  Over a nearly two-year period prior to Google's lawsuit, it was these corporate interest groups who determined AG Hood's demands, these corporate

interest groups who devised the strategy for enlisting the help of other state attorneys general, and these corporate interest groups who drafted the CID that AG Hood sent.  Throughout that time, Orrick communicated extensively with AG Hood's office and with its allies to plot their "Project Goliath" strategy.  Google's requests for documents relating to that effort will undoubtedly shed further light on AG Hood's thinking.  They may further show, for example, that AG Hood and Orrick expressly discussed use of the CID as a retaliatory measure—a weapon to be used if Google did not capitulate in their demands.  The documents are also likely to demonstrate that AG Hood and Orrick knew just how oppressive and burdensome the 79-page CID was, and that it was intentionally drafted it that way in the hopes of increasing its coercive effect.  In short, Google's requests that Orrick produce documents discussing AG Hood and his investigation of Google are not only reasonably calculated to lead to the discovery of admissible evidence regarding AG Hood's motives, but they are likely to uncover some of the most relevant information in the case.

The requested documents are similarly relevant to AG Hood's affirmative defense based on the *Younger* abstention doctrine.  *See Younger v. Harris*, 401 U.S. 37 (1971).  AG Hood contends that despite the impact of his CID on Google's constitutional rights, Judge Wingate should have abstained in favor of resolution in Mississippi state courts.  MS Dkt. 93 (AG Hood's Answer); *see also* MS Dkt. 32 (AG Hood's Motion to Dismiss).  But *Younger* is inapplicable where a state official's conduct is improperly motivated or undertaken in bad faith.  *See, e.g., Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979).  And as Judge Wingate held, Google has already adduced "significant evidence of bad faith" in AG Hood's treatment of Google.  Orrick's documents should reveal considerably more such evidence, showing that it was the desires and contributions of his corporate benefactors, rather than concerns about Mississippi law, that moved AG Hood to act against Google.

Orrick's documents also bear directly on Google's claim that AG Hood's investigation, and specifically the CID, were intentionally overbroad and burdensome and thus constitute an unreasonable search and seizure in violation of Google's 4th Amendment rights.  Compl. ¶ 103. Judge Wingate preliminarily concluded that the CID's scope exceeds AG Hood's powers in sev-

eral respects.  For one, a large number of the CID's requests for information relate to alleged copyright infringement taking place through Google's service.  As Judge Wingate noted, "[i]t is well-established that state attorneys [general] lack the authority to enforce the Copyright Act."  Rubin Decl., Exh. 31 (PI Order) at 20.  It appears that AG Hood demanded this information for an illegitimate purpose (presumably to appease special interests for whom copyright is a paramount concern).  The CID similarly demands extensive information to support AG Hood's threats to hold Google responsible for third-party content published on Google's services.  *See* MS Dkt. 17, Exh. 30 (CID).  But, as Judge Wingate recognized, Section 230 of the Communications Decency Act, 47 U.S.C. § 230, immunizes Google from claims based on such content. Rubin Decl., Exh. 31 (PI Order) at 16-17 (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content.")).  Given that, it appears that here again, AG Hood demanded information not for any legitimate purpose, but instead to unduly burden and harass Google as a means of pressuring it to censor speech on the Internet.  In light of its role in researching and preparing the CID, it is quite likely that Orrick discussed the CID's impermissible overbreadth and obvious burden in communications with AG Hood, other government officials, and other interested parties.  Documents reflecting those communications—indeed, any documents relating to the scope and burden of AG Hood's investigation of Google—are directly relevant to Google's Fourth Amendment claim.

Finally, the documents that Google seeks will bear on AG Hood's credibility. In his answer in this case, for example, AG Hood denies coordinating with third parties and lobbyists regarding Google.  *See, e.g.*, MS Dkt. 93 (Def.'s Answer), ¶ 64.  Given what Google already has seen, that cannot withstand scrutiny.  The documents Google seeks, such as Orrick's meeting notes, agendas, action lists, and reports on verbal conversations will show extraordinary coordination between AG Hood, Orrick, and other lobbyists and third parties, thereby undermining AG Hood's averments.

Unlike its allies, Orrick has refused to produce *any* documents in response to the subpoena.  It is withholding all communications with AG Hood's office under dubious assertions of

privilege, even though AG Hood has already produced documents constituting his communications with Orrick.  There is no basis to continuing withholding these documents.

Orrick claims that all other documents—such as those in which Orrick planned or recounted meetings and conversations with AG Hood—are irrelevant, simply because AG Hood never saw them.  That is specious.  Indeed, Judge Schofield recognized as much in her comments regarding Google's motion to transfer in the Southern District of New York:

> [I]t seems to me that there are all sorts of documents that Attorney General Hood never saw that are conceivably relevant. Certain kinds of e-mail communications internally of your client that might relate to the subject for example. Those could be highly relevant.

Rubin Decl., Ex. 33, at 15:6-15:11 (July 29, 2015 Hearing Transcript).  Judge Schofield, of course, is correct—several of the most damning documents surfaced to date are not direct correspondence between the special interests and AG Hood, but rather their communications amongst themselves.  *See e.g.*, Mullin Article (quoting email where Mr. Perrelli writes to MPAA and others about getting Hood focused on "key issues and the asks"); Brandom Article (quoting email where MPAA lobbyist states that "it is time to move to actually form an investigation.").[21]   It is in these internal communications, rather than in documents Orrick presumably knew would be subject to public records requirements, where the true nature of AG Hood's actions is most likely to be revealed.

## II.    Orrick Has Not Validly Asserted Any Privilege

Orrick has also invoked various privileges to block any discovery into its involvement in AG Hood's investigation.  Orrick contends that all of the documents Google seeks are protected under the work product doctrine, a "law enforcement" privilege, the common interest doctrine, or

---

[21] Internal documents also reveal communications from other state attorneys general declining to join AG Hood's efforts or sign his letters to Google, *See* Rubin Decl., Exh. 23, D000069  (email from Vans Stevenson of the MPAA to AG Hood asking, "[h]ow are you coming with AGs signing on to the sign-on letter?  As we talked about, let me know if you need help motivating any of your colleagues."); *see also* Mullin Article (quoting Feb. 27, 2014 email from Perrelli saying "some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing CIDs before mid-May.").

the attorney-client privilege.  When Google pressed for support of these assertions, Orrick of-

fered nothing but conclusory statements.[22]  That is insufficient.  *In re Santa Fe Int'l Corp.*, 272

F.3d 705, 710 n.7 (5th Cir. 2001) ("Fifth Circuit cases clearly hold that the privilege claimant's

burden extends to proof of preliminary facts showing that the matter is eligible for protection.");

*see also United States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002) ("The burden is on the

party asserting the privilege to establish all the elements of the privilege.").

Orrick's inability to substantiate its privilege assertions is no surprise. To begin with, it

has not even collected responsive documents and thus could not possibly know whether any priv-

ilege applies to them.  More fundamentally, the notion that its lobbying activities can be cloaked

in privilege is untenable.  Orrick worked hand-in-hand with a government official, with whom it

has no attorney-client relationship.[23]  In an attempt to further AG Hood's actions against Google,

Orrick advised AG Hood on what to say to Google and other state attorneys general,[24] developed

and guided AG Hood's overall strategy,[25] and helped coordinate AG Hood's PR attack plan.[26]

That conduct is the very definition of lobbying. *See* Miss. Code Ann. § 5-8-3(k) ("'Lobbying'

means: (i) Influencing or attempting to influence legislative or executive action through oral or

written communication; or (ii) Solicitation of others to influence legislative or executive action;

or (iii) Paying or promising to pay anything of value directly or indirectly related to legislative or

executive action.").

---

[22] Rubin Decl. ¶ 13.

[23] Rubin Decl. ¶ 13.

[24] Rubin Decl., Exh. 14, JB_0000014-16 (Rob McKenna gives specific advice to AG Hood about structuring AG Hood upcoming presentation at the NAAG meeting in Denver, including recommending the use of printouts of screenshots rather than a live demo.).

[25] Rubin Decl., Exh. 12, JB_00000547 (Brian Moran tells AG Hood's staffers and third parties that he will "take lead on the one page strategy paper.").

[26] Rubin Decl., Exh. 24, D000907-908 (AG Hood's proposed plan for pursuing Google, which included "working with a PR firm to create an attack on Google" and "plac[ing] an editorial in the [Wall Street Journal] emphasizing that Google's stock will lose value in the face of a sustained attack by AGs."); *id.*, Exh. 25, D001319-1323 (McKenna contacts third parties about "finding an outlet" for AG Hood's anti-Google op-ed, and offers "to discuss placement strategy" with AG Hood).

Orrick and the third parties they worked with clearly hoped that by using lawyers to spearhead their lobbying activity they could cloak their entire effort in privilege. But that position finds no support in the law. Orrick could not have had an expectation that such communications could be kept confidential—particularly in light of Mississippi's freedom of information law.[27] And absent an expectation of confidentiality, there can be no privilege. *See United States v. El Paso Co.,* 682 F.2d 530, 539 (5th Cir. 1982) ("The need to cloak [privileged] communications with secrecy, however, ends when the secrets pass through the client's lips to others. Thus, a breach of confidentiality forfeits the client's right to claim the privilege.") (citation omitted); *see also In re Oracle Sec. Litig.*, No. C-01-0988 MJJ, 2005 U.S. Dist. LEXIS 46931, at *34 (N.D. Cal. Aug. 5, 2005) ("Voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else.") (citation omitted).

Courts have applied this basic principle to reject attempts to cloak lobbying efforts in secrecy through privilege invocations. In *Baricuatro v. Industrial Personnel & Management Services, Inc.*, for example, the court considered a claim of work product privilege asserted over documents a party had voluntarily submitted to Federal agencies with the hope of securing an advantage against an adversary. No. 11-2777, 2013 U.S. Dist. LEXIS 96413, at *36-38 (E.D. La. July 5, 2013). The court concluded that the documents had been offered up "with the primary purpose of provoking or assisting in the government's criminal or administrative investigations." *Id.* at *37. As the court recognized, the voluntary submission of documents waived any work product privilege over the documents. *Id.* Similarly, in *Bank of America, N.A. v. Terra Nova Insurance Co.*, the court considered materials disclosed by a private party during meetings with state and Federal law enforcement agencies where the party hoped to induce action against an adversary. 212 F.R.D. 166, 172-74 (S.D.N.Y. 2002). As the court pointed out, there was "a strong potential that the material may ultimately become public and thus available to an adver-

---

[27] *See* Mississippi Public Records Act, Miss. Code Ann. § 25-61-1 *et. seq.*

1  sary."  *Id*. at 172-73 ("Disclosing information to governmental authorities in the hope that they

2  will attack an adversary, however, cannot be said to be done in the pursuit of trial prepara-

3  tion.  Thus, disclosure in such a situation results in a waiver of the work product protection.")

4  (internal quotation omitted); *see also Cante v. Baker*, No. 07-CV-1716 (RK), 2008 U.S. Dist.

5  LEXIS 38091, at *2 (E.D.N.Y. May 9, 2008) (rejecting privilege claims over materials submitted

6  to a government agency to induce beneficial action).  In other words, when a party makes a "vol-

7  untary submission of material to a government agency to incite it to attack the informant's adver-

8  sary," that party cannot then go on to claim privilege over those materials.  *Info. Res. v. Dun &*

9  *Bradstreet Corp.*, 999 F. Supp. 591, 593 (S.D.N.Y. 1998); *see also Three Crown Ltd. P'ship v.*

10  *Salomon Bros.*, No. 92 Civ. 3142 (RPP), 1993 U.S. Dist. LEXIS 9995, at *6 (S.D.N.Y. July 21,

11  1993) ("[T]he Court will allow liberal discovery of statements made or documents submitted to a

12  governmental agency prior to the initiation of an investigation of any defendant in this litigation

13  concerning the subject matter of this litigation.").

14  **a.  Work Product**

15  Orrick also invokes work product protection over all of its communications with AG

16  Hood, claiming that the privilege automatically attaches merely because AG Hood supposedly

17  "initiated" those conversations.  But Google has already received documents from other parties

18  that show that Orrick was frequently the one who initiated contact with AG Hood's office, not

19  the other way around.[28]  And even if Orrick were right, the "work product doctrine focuses only

20  on materials assembled and brought into being in anticipation of litigation."  *El Paso*, 682 F.2d at

21  542 ("The work product doctrine is not an umbrella that shades all materials prepared by a law-

22  yer"); *see also United States v. Torf (In re Grand Jury Subpoena)*, 357 F.3d 900, 907 (9th Cir.

23  2003) (for work product protection to apply, documents "must be prepared in anticipation of liti-

24  gation or for trial.") (quotations omitted).  In the parties' meet and confer discussion, Orrick was

25  _____

26  [28] *See, e.g.*, Rubin Decl., Exh. 12, JB_00000546-547 (Brian Moran of Orrick writes to Hood
    staffers and Jenner attorneys to "divide up" state Attorneys General in order to maximize "out-

27  reach time" at an upcoming NAAG meeting in Denver, saying that he is "happy to assign" who
    will reach out to whom.).

28

1  unable or unwilling to identify any supposed litigation it contemplated.  Rubin Decl. ¶ 13.  This

2  absence of actual or anticipated litigation dooms any claim to work product protection, even put-

3  ting aside: (i) Orrick's failure to specify the documents over which the protection is claimed; (ii)

4  their failure to substantiate the claim when asked; and (iii) the forfeiture of any hypothetical pro-

5  tection over documents by virtue of sharing them with AG Hood or others.

6  ### b.  The "Law Enforcement" Privilege

7  Orrick's assertion of a "law enforcement" privilege is similarly misplaced.  "The law en-

8  forcement/investigatory files privilege is a privilege that is exclusive to the government." *United*

9  *States ex rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 687 (S.D. Cal. 1996); *see also Unit-*

10  *ed States v. McGraw-Hill Cos.*, No. CV-13-779-DOC, 2014 U.S. Dist. LEXIS 59408, at *18-19

11  (C.D. Cal. Apr. 15, 2014) (privilege invoked via "a formal claim ... by the head of the depart-

12  ment having control over the requested information" based upon "actual personal consideration

13  by that official[]" and requiring a specific identification of the privileged material, including "an

14  explanation why it properly falls within the scope of the privilege.").[29]  When applying the privi-

15  lege, courts "balance the need for disclosure with the government's legitimate need to acquire

16  and maintain confidential information for sensitive activities." *Doyle v. Gonzales*, No. S-11-0066

17  GEB, 2011 U.S. Dist. LEXIS 100639, at *14 (E.D. Cal. Sept. 6, 2011); *cf. Coughlin v. Lee*, 946

18  F.2d 1152, 1159 (5th Cir. 1991) (noting that the law enforcement privilege is "a *qualified* privi-

19  lege protecting investigative files in an ongoing criminal investigation or information which

20  would reveal the identity of confidential informants" (emphasis added)); *Ibrahim v. Dep't of*

21  *Homeland Sec.*, No. C-06-00545 WHA, 2013 U.S. Dist. LEXIS 56663, at *15 (N.D. Cal. Apr.

22

23  [29] *See also Hayslett v. City of San Diego*, No. 13-CV-1605-W, 2014 U.S. Dist. LEXIS 37738, at

24  *5-6 (S.D. Cal. Mar. 21, 2014) ("the party invoking the privilege must at the outset make a sub-
stantial threshold showing by way of a declaration or affidavit from a responsible official with

25  personal knowledge of the matters to be attested to in the affidavit") (citations and internal quo-
tations omitted); *McGraw-Hill Cos.*, 2014 U.S. Dist. LEXIS 59408, at *21 ("the Court will not

26  protect those documents until the claiming official has seen and considered the contents of the
documents and states with specificity the rationale of the claimed privilege. In short, the Gov-

27  ernment cannot escape its duty to disclose documents by merely brandishing a general claim of
privilege.") (citations and internal quotations omitted).

28

1   19, 2013) (privilege exists to protect witness and law enforcement personnel, privacy, and "oth-

2   erwise to prevent interference with an investigation") (citation omitted).

3        Because Orrick is not itself a government entity, it cannot hide documents behind the

4   privilege here.  Moreover, AG Hood has produced a host of communications with Orrick, further

5   establishing the inapplicability of the privilege.  That production and those by other parties also

6   eliminate any "legitimate need" to keep these communications confidential.  Finally, Orrick has

7   not carried its burden of showing the privilege could somehow be applicable as it has not even

8   attempted to explain how its documents could expose any investigative files or reveal the identity

9   of confidential sources.  For all of these reasons, Orrick's assertion of the law enforcement privi-

10  lege is untenable.

11                              **c.  "Common Interest Doctrine"**

12       Although occasionally termed a privilege itself, "[t]he common-interest is, essentially, an

13  exception to the waiver rule of the attorney-client privilege."  *Integrated Global Concepts, Inc. v.*

14  *j2 Global, Inc.*, No. 5:12-CV-034340RMW, 2014 U.S. Dist. LEXIS 7294, at *4 (N.D. Cal. Jan.

15  21, 2014).  The doctrine prevents the loss of privileged status "if a privileged communication is

16  shared with a third person who has a common legal interest with respect to the subject matter of

17  the communication."  *In re Santa Fe*, 272 F.3d at 711 (citation omitted).  To invoke the doctrine,

18  parties must be under a "palpable threat of litigation at the time of the communication."  *See id.*;

19  *Integrated Global Concepts,* 2014 U.S. Dist. LEXIS 7294, at *5 (the common interest doctrine

20  "generally applies where allied lawyers and clients work together in prosecuting or defending a

21  lawsuit so that they may exchange information among themselves without waving [sic] the privi-

22  lege, although it may, in rare cases, be extended to situations where there is anticipated joint liti-

23  gation, but nothing pending imminently.") (internal quotations omitted).  The fact that parties

24  may share commercial interests or business objectives is not sufficient to justify invocation of the

25

26

27

28

common interest doctrine.[30]  Disclosure of privileged communications to other parties in that setting waives the privilege.

Orrick cannot claim the protections of the common interest doctrine with respect to documents regarding Google or AG Hood's investigation that were shared with AG Hood or other parties.[31]  *See Baricuatro*, 2013 U.S. Dist. LEXIS 96413, at *37 (no possible commonality of interest between lobbyists and government agency that might provide basis for maintaining privilege).  Orrick was unable during the parties' meet and confer to identify any litigation that was contemplated at the time when these documents were created and/or shared, instead only insisting that their client Microsoft somehow had a common interest with other third parties in responding to AG Hood's requests.  Rubin Decl. ¶ 13.  But a "common" desire to hide their backroom anti-Google lobbying is not what the common interest doctrine protects.  Neither Orrick nor Microsoft are co-defendants with AG Hood or any other relevant third party, and the documents produced to date make it clear that the efforts to attack Google had far more to do with dirty tricks than with litigation. *See, e.g.,* Rubin Decl., Exh. 18,  JB_00000391 (email between movie studios, Orrick, Jenner & Block, and others discussing the possibility of using a New York Times article in a media campaign against Google).  Orrick's invocation of the common interest doctrine is meritless.

---

[30] *See Ferko v. NASCAR*, 219 F.R.D. 403, 406 n.1 (E.D. Tex. 2003) ("A commercial interest, however, does not trigger the common interest doctrine."); *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 579 (N.D. Cal. 2007) (stating that "the basic requirement of the common interest exception [is] that the parties must have a common legal, as opposed to commercial, interest. . . .[T]he disclosures which concern the instant litigation, to be protected, must be made in the course of formulating a *common legal strategy.*" (emphasis in original) (internal quotations and citations omitted); *Elan Microelectronics Corp. v. Apple, Inc.*, No. C-09-01531-RW, 2011 U.S. Dist. LEXIS 87989, at *9 (N.D. Cal. Aug. 8, 2011) (common interest exception "does not extend to communications about a joint business strategy that happens to include a concern about litigation.").

[31] *See, e.g.*, Rubin Decl., Exh. 19, JB_00000457 (email between Orrick, staffers at Hood's office, Tom Perrelli, Mike Moore and his assistant, Tom Galvin of the Digital Citizens Alliance, Patrick Lynch, and others regarding a future meeting with AG Hood); *id.*, Exh. 15, JB_00000555-557 (email sent from Rob McKenna of Orrick to Hood staffers, Mike Moore, and multiple people at Jenner & Block).

#### d.  The Attorney Client Privilege

Lawyers at Orrick helped lead the charge in the effort to lobby AG Hood.  But the mere involvement of lawyers does not cloak the entire enterprise in the attorney-client privilege.  Documents in which lawyers discuss campaign contributions, ghostwrite materials for government officials, plan media campaigns, and devise strategies to influence public policy are not communications made for the purpose of obtaining legal advice, and are not privileged.  *See In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270, 289-91 (S.D.N.Y. 2001) (no privilege for communications between lawyer and client on whose behalf he was lobbying for a presidential pardon:  "Communications about non-legal issues such as public relations, the solicitation of prominent individuals or persons with access to the White House ... to support the Petition, and strategies for persuading the President to grant the petition are not privileged."); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 165-66 (S.D.N.Y. 2010) (privileges are "not intended, however, to obscure what is essentially a lobbying and political effort, even one undertaken by a lawyer. . . .[M]atters conveyed to the attorney for the purpose of having the attorney fulfill the lobbyist role do not become privileged by virtue of the fact that the lobbyist has a law degree or may under other circumstances give legal advice to the client.") (citation and internal quotations omitted); *cf. North Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003)  ("[L]egal advice must predominate for the communication to be protected," and "when the legal advice is merely incidental to business advice, the privilege does not apply") (internal quotations and citations omitted); *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) ("The privilege does not protect an attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys.").  Beyond that, as noted, the sharing of a document with AG Hood and other third parties waives any attorney-client privilege that would otherwise attach to a document.  *See supra*, p. 18-20; *El Paso*, 682 F.2d at 539.

But even if there are documents over which a claim of attorney-client privilege might be defensible, Orrick must substantiate that claim in a privilege log, something it has refused to do. Orrick's complaints about burden are unavailing—if they withhold documents on the basis of

privilege, they must explain the basis of the privilege or risk waiver.  *Felham Enters. (Cayman) Ltd. v. Certain Underwriters at Lloyds,* No. Civ. A. 02-3588, 2004 WL 2360159, at *3 (E.D. La. Oct. 19, 2004) (finding a waiver where defendant failed to produce a timely privilege log and the log it ultimately produced failed to sufficiently describe the withheld documents); *see also Burlington Northern & Santa Fe Ry. v. United States Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005) (holding that "boilerplate objections or blanket refusals" were insufficient to assert a privilege and courts should consider the level of detail provided and the timeliness of that information in determining if a party had waived the privilege).  It is well-established that failure to provide a privilege log prior to the return date of a subpoena results in waiver of "any privilege."  *In re Chevron Corp.*, 749 F. Supp. 2d 170, 180  (S.D.N.Y. 2010) (Rule 45 requires parties to "serve either written objections or move to quash within the earlier of the time fixed for compliance or fourteen days after service and, if withholding subpoenaed material on the grounds of privilege, [they] must provide a privilege log."); *see also Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 594 (W.D.N.Y. 1996) (finding Defendant waived privilege by taking position that it would not create a privilege log until after the court ruled on its overbreadth and burden objections).[32]

### e.  The Requests Are Not Unduly Burdensome

Orrick cannot carry its burden of showing the requests are unduly burdensome.  *See Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014) ("A party resisting discovery must

---

[32] *See also* Charles Wright & Arthur Miller, Fed. Prac. & Proc., § 2464 ("[Federal] Courts consistently have held that such a party is required to produce a document index or privilege log, and that the failure to produce a log of sufficient detail constitutes a waiver of the underlying privilege or work product claim."); *see also Blackard v. Hercules, Inc.*, No. 2:12-CV-175-KS-MTP, 2014 U.S. Dist. LEXIS 75934, at *14-15 (S.D. Miss. June 4, 2014) ("It is well within this Court['s] discretion to find a waiver of the asserted privileges for failing to timely produce a privilege log." (citations omitted)); *Vieste, LLC v. Hill Redwood Dev.*, No. C-09-04024-JSW, 2010 U.S. Dist. LEXIS 126607, at *24-25 n.3 (N.D. Cal. Nov. 18, 2010) ("This Court's standing order regarding discovery provides that when a party 'withholds information that is responsive to a discovery request by claiming that it is privileged or otherwise protected from discovery, that party shall promptly prepare and provide a privilege log that is sufficiently detailed and informative to justify the privilege.' . . . The order further specifies that any party's '[f]ailure to furnish this information promptly may be deemed a waiver of the privilege or protection.'") (citations omitted).

1    show specifically how each interrogatory or document request is overly broad, unduly burden-

2    some, or oppressive . . . by submitting affidavits or offering evidence revealing the nature of the

3    burden.  Failing to do so, as a general matter, makes such an unsupported objection nothing more

4    than unsustainable boilerplate.") (citations omitted); *In re ATM Fee Antitrust Litig.,* 233 F.R.D.

5    542, 545 (N.D. Cal. 2005) (party failed to substantiate its claim of undue burden where it offered

6    only "a blanket objection without specifics sufficient to justify denying discovery.") (citations

7    omitted).

8         Google's requests are quite narrow and targeted.  They seek only (1) documents that spe-

9    cifically reference both Google and AG Hood; (2) documents leading up to AG Hood's investi-

10   gation of and CID to Google, including those concerning the investigation itself and those using

11   the specific code names for the projects run by the special interest groups; and (3) documents

12   concerning the special interests groups' campaign contributions and other assistance to AG

13   Hood.  These are categories of documents that are specific, directly focused on issues relevant to

14   this case, and lend themselves to targeted keyword searches.  They are also limited in time, seek-

15   ing only documents from the last three years, the period cabining what the interested parties

16   called "Project Goliath." *See supra* n.5.

17        According to Orrick, at its outer limit, Google's subpoena would call upon it to review

18   18,000 documents. Rubin Decl. ¶ 14. If that truly is the number of potentially responsive docu-

19   ments, there is nothing shocking about it, except what it reflects about the extent of Orrick's role

20   in AG Hood's unconstitutional efforts to censor Google's speech.[33]  Having helped orchestrate

21   AG Hood's three-year campaign, and having worked with a disparate group of special interests,

22

23   [33] *See e.g., Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc*., No. 12-CIV-1579 (HB),
     2013 U.S. Dist. LEXIS 41785, at *17 (S.D.N.Y. Mar. 25, 2013) (review of three quarters of a

24   million documents "by itself, does not warrant curtailing discovery."); *Tiger Capital, LLC v.
     PHL Variable Ins. Co*., No. 12-CIV-2939 (CM), 2013 U.S. Dist. LEXIS 121395, at *13-14

25   (S.D.N.Y. Aug. 26, 2013) (compelling production of responsive documents from set of two mil-
     lion documents collected); *Viacom Int'l, Inc. v. YouTube, Inc*., No. C-08-80211, 2009 U.S. Dist.

26   LEXIS 4220, at *15 (N.D. Cal. Jan. 14, 2009) (compelling review of more than one million doc-

27   uments where subpoena target had acted as plaintiff's agent).

28

their lobbyists, the press, and other government officials, it is no surprise that Orrick accumulated a raft of relevant documents. To the extent there is burden associated with the process of reviewing those documents, it is by no means undue. It is simply the natural result of Orrick having voluntarily involved itself so intimately in AG Hood's unlawful conduct in the hopes of serving the interests of its client, Microsoft.

## **CONCLUSION**

For the foregoing reasons, Google respectfully requests an order compelling Orrick immediately to produce all documents responsive to Google's requests.

Dated: August 3, 2015

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *David H. Kramer*
David H. Kramer

*Attorneys for Petitioner*
GOOGLE INC.

## ATTESTATION

I, David H. Kramer, am the ECF User whose identification and password are being used to file this **NOTICE OF MOTION AND MOTION TO COMPEL COMPLIANCE WITH SUBPOENA** and supporting papers.  In compliance with Civil L.R. 5-1, I hereby attest that Michael H. Rubin has concurred in this filing.

Dated:  August 3, 2015                          By: /s/ *David H. Kramer*
                                                                    David H. Kramer